## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

### Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for about 15 years, the 6.5 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to

facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

    2.    I make this application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices and their contents:

    a.    **Subject Device 1**: White/Silver, iPhone SE, Model 2020, ESN 0x01bfdf8e6421f5e8, in a black & gold case.

    b.    **Subject Device 2**: Black, Schok Volt SV55 smartphone, Model SV55216, IMEI 356566229243878.

as identified in Attachment A (collectively "**Subject** Devices"). **Subject Devices** were both seized at 521 Pearl Street, Apt 2, Kalamazoo, MI on June 21, 2023 by U.S. Probation Officers and KVET investigators during a search of Joseph STRICKLAND's residence and vehicle pursuant to the conditions of his federal supervised release. **Subject Device 1** was seized from Joseph STRICKLAND's person and **Subject Device 2** was seized from the kitchen counter of 521 Pearl Street, Apartment 2. Both **Subject Devices** are currently in the custody of KVET in Kalamazoo, MI.

    3.    The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

4.    I submit that there is probable cause to believe that evidence of Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C § 841(a)(1), will be found on the **Subject Devices.**

5.    The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This application is intended to show merely that there is probable cause for the requested search of the **Subject Devices** and does not set forth all of my knowledge about this matter.

## Background

6.    On May 5, 2020, Joseph Lee STRICKLAND was indicted in the Western District of Michigan (1:20-cr-00062-JTN) on one count of Possession with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. § 841(a)(1).

7.    After a guilty plea, on October 15, 2020, STRICKLAND was sentenced to the Federal Bureau of Prisons for a term of confinement of thirty (30) months and a term of supervised release for six (6) years, which commenced in July 2022.

8.    As part of STRICKLAND's supervised release, as ordered by U.S. District Court Judge Janet T. Neff, STRICKLAND was subject to Special Condition #6, which stated:

> *You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C.§ 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.*

## Probable Cause

9. On June 7, 2023, KVET investigators conducted a controlled buy from STRICKLAND, utilizing a KVET Confidential Source (KVET CI# 1574[1]). During the controlled buy, the KVET CS contacted STRICKLAND at phone number 269-366-0512 and ordered a quantity of crack cocaine and heroin. The KVET CS was directed to 521 Pearl Street, Apt 2, Kalamazoo, MI by STRICKLAND. Upon arrival at that location, the KVET CS contacted an individual at the door to Apartment 2 to conduct the transaction. The KVET CS then left, returned to investigators, and turned over a quantity of crack cocaine and heroin. During the debriefing, the KVET CS told investigators it was STRICKLAND who met him/her at the front door and handed him/her the crack cocaine and heroin. KVET Investigators continued surveillance of 521 Pearl Street, Apt 2, and later confirmed STRICKLAND exiting the apartment and standing on the front porch. The crack cocaine field tested positive.

10. One June 21, 2023, the U.S. Probation Office Search and Seizure Team ("U.S. Probation") conducted a search[2] of STRICKLAND's approved residence, 521 Pearl Street, Apartment 2, Kalamazoo, MI. U.S. Probation later sought the assistance of KVET.

---

[1] KVET CI #1574 has conducted six successful controlled buys for KVET and provided information to investigators on at least ten different occasions. The information he/she has provided has been found to be factual, credible, and reliable. KVET CI #1574 had intially been working with KVET for consideration on pending criminal charges, and now continues to work with KVET for monetary gain.

[2] Pursuant to the search condition, reasonable suspicion was previously established and approved by the Chief Probation Officer on June 2, 2023.

4

11. During the search, U.S. Probation first attempted to contact STRICKLAND at the apartment, however, were unsuccessful. U.S. Probation then checked STRICKLAND's electronic location monitoring and found that he had left the address earlier in the morning. U.S. Probation attempted to call STRICKLAND at 269-366-0512 but there was no answer. U.S. Probation that texted STRICKLAND at the same number to return home to have his location monitoring equipment checked. The phone number called by U.S. Probation was the same phone number used by the KVET CS to arrange the previous controlled buy.

12. At approximately 7:55am, U.S. Probation observed a tan Hyundai Sante Fe, bearing Michigan registration EBC3071, driving in the area. U.S. Probation positively identified the driver as STRICKLAND and he was the lone occupant of the vehicle. The vehicle appeared to be heading to 521 Pearl Street. The vehicle and STRICKLAND returned to 521 Pearl Street, parked in front of the residence. U.S. Probation then contacted STRICKLAND at the door to 521 Pearl, Apartment 2, detained him, and cleared the residence. A female, Asia Holiday, was also located sleeping in the bedroom of the residence.

13. U.S. Probation searched STRICKLAND's person and located **Subject Device 1**, and a his wallet in his pockets. U.S. Probation requested the passcode to **Subject Device 1** from STRICKLAND, but STRICKLAND advised he did not know the passcode. STRICKLAND was confronted with the fact that refusing to provide the passcode was a violation of his search condition and again stated he did not know the passcode to the phone that was in his pocket.

5

14. During a search of the tan Hyundai Sante Fe, bearing Michigan registration EBC3071, U.S. Probation located:

    a. Three knotted sandwich bags wrapped in latex gloves in the center console of the vehicle. Each bag contained the following, all of which were tested by the Kalamazoo Crime Lab:

- Baggie 1 [KDPS Item 12]:
    - Knotted sandwich bag w/ white powder in which no controlled substance was detected.
    - Knotted Sandwich bag with grey powder determined to be 2 grams of fentanyl.
    - Paperfold w/ 4 blue tablets "M30" determined to be .70 grams of fentanyl.
- Baggie 2 [KDPS Item 13] – knotted sandwich bag with white chunk material determined to be 12.21 grams of cocaine base.
- Baggie 3 [KDPS Item 14] – knotted sandwich bag containing white powder determined to be 3.30 grams of fentanyl.

    b. Box of sandwich bags was also located on the driver's seat of the vehicle.

    c. Ripped lottery tickets on floorboard, center console, cupholders.

15. Inside the apartment, U.S. Probation located:

    a. Two digital scales in a kitchen drawer.

    b. Torn lottery tickets in kitchen drawers.

    c. Commercial respirator in a kitchen cabinet.

    d. Box of latex gloves in a kitchen cabinet.

    e. Used latex gloves in the kitchen trash and on counter.

    f. Box of sandwich bags.

    g. **Subject Device 2** on kitchen counter.

    h. Jacket with a receipt in pocket for "Joseph Strickland" in living room.

16. STRICKLAND was read his Miranda warnings on scene and agreed to speak with KVET Investigators. STRICKLAND denied knowledge about the drugs in the vehicle. STRICKLAND confirmed he was the sole occupant of 521 Pearl Street, Apt 2, and the female was his girlfriend, but did not live with him. When asked about the drug paraphernalia located in the apartment he requested to be taken to jail.

17. The female present, Asia Holiday, was also interviewed by investigators. Holiday confirmed she is the girlfriend of STRICKLAND and she lived on Cobb Ave in Kalamazoo, not 521 Pearl Street, Apt 2. Holiday confirmed she is the owner of the Hyundai Sante Fe, which STRICKLAND was driving, but was unaware he took the car while she was sleeping and only found out when U.S. Probation knocked and woke her up. Holiday denied owning any illegal drugs in the vehicle.

7

18. STRICKLAND was arrested the same day on State of Michigan felony drug charges pending federal supervised released violation proceedings and possible federal drug charges. STRICKLAND was lodged at the Kalamazoo County Jail.

19. Based on the special search condition of supervised release, a data extraction of **Subject Device 2** was obtained by Michigan State Police (MSP) Computer Crimes Unit (CCU) analysts. Examination of the device is ongoing, however I do know that the device had phone number 269-443-9725, which is NOT the phone number investigators used to contact STRICKLAND on the day of the search and arrest.

20. **Subject Device 1** was also provided to MSP CCU analysists. I was informed by DFA Deloof that **Subject Device 1** was operating iOS 16.4.1 and current mobile forensic examination hardware/software available to MSP and KDPS does not support data extractions for iPhones operating this operating system, at this time.

21. I respectfully request that this court authorize the data extraction/examination of **Subject Devices** at any time, as I know that current mobile forensic examination hardware/software tools frequently release updates to their products, and although data extraction/examination is not capable as of this continuation, it could become available in the coming days/weeks/months.

22. Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business. For example, I have encountered drug dealers that use one cell phone/phone number

8

to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers.

  23. Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

    b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

    b. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

    d. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

    e. It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions,

9

bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

  f. That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

  g. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

  h. Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

### Technical Terms

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data

communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

11

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most internet service providers control a range of IP addresses.  Some computers have static—that

is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

25. Based on my training, experience, and research, I know that the **Subject Devices** have capabilities that allows them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of drug trafficking.

### Electronic Storage and Forensic Analysis

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30. I submit that this application supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the evidence of drug trafficking offenses described in Attachment B.